IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ONIX CORNEJO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. H-07-2571 |
| | § | |
| SY FOOD, INC., d/b/a FOOD WORLD, and SALAH YOUSEF, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Presently before the court is 3MQ, Inc.'s Emergency Motion Seeking Return of Wrongfully Seized Assets of 3MQ, Inc., d/b/a/ Greens Check Cashing, (Docket Entry No. 102), and the response filed thereto. The court heard testimony on this matter and makes the following findings of fact:

1. In September 2009, Plaintiff obtained a final judgment against Defendants SY Foods, Inc., d/b/a Food World, and Salah Yousef ("Yousef"), owner of SY Foods, Inc., in the amount of $71,374.19.[1]

2. On March 27, 2010, Plaintiff attempted to execute on the judgment at the Food World grocery store. Plaintiff, along with several deputy U.S. marshals, seized $51,350.36 in cash from the premises; most of the seized cash came from a safe located inside the store's customer service booth. Petitioner 3MQ, Inc., claims that it is the owner of a portion of the seized cash.

---

[1] See Final Judgment, Docket Entry No. 96.

3. Musa M. Qasem ("Qasem") registered an Assumed Name as Greens Check Cashing in April 2002. In April 2003, Qasem incorporated 3MQ, Inc., which he owns and manages. 3MQ, Inc., doing business as Greens Check Cashing, operates a check cashing, money transfer and phone card business inside the Food World grocery store's customer service booth.

4. Qasem testified that Food World's safe had two drawers, both of which had combination locks. Qasem stated that his business, 3QM, used the bottom safe drawer, and that he did not know the combination to the store's portion of the safe.

5. Qasem stated that when he explained to the deputies that he ran a separate business from the customer service booth and paid rent to the store, they demanded the rent owed to Food World. Qasem paid $2,000 cash reflecting his March rent. This payment was noted on the U.S. Marshal's receipt. Qasem testified that the deputy marshals also seized approximately $2,500 from his cash register drawer in the customer service booth. The U.S. Marshal's receipt corroborated that $2,559.33 was seized from Qasem's cash drawer.

6. Qasem testified that the deputies demanded that he open the bottom drawer of the safe. In later testimony, he was equivocal whether he had actually unlocked the safe drawer.

7. Qasem explained that he generally keeps a significant amount of cash on hand because he cashes checks. After the

hearing, Qasem produced documents that were represented to be his business records for several days preceding the seizure to support his testimony that he had over $34,000 in cash on hand at the time of the seizure.

8. Qasem's business records are kept in a spiral notebook. On Sunday, March 21, 2010, the notebook page shows a starting cash balance of $5,972.28. On that day, Qasem recorded that he sold $707.86 in money orders and $3,295.78 in Western Union transfers and collected $355.90 in utility payments and $29.29 in fees. He cashed checks in the amount of $3,852.19 and recorded an ending cash balance of $6,507.73.

9. On Monday, March 22, 2010, Qasem's log showed that he started with a cash balance of $6,507.73 and sold $7,262.68 in money orders, $12,113.59 in Western Union transfers and collected $2,128.26 in utility payments and $166.19 in fees. Qasem cashed $13,386.40 in checks and recorded an ending cash balance of $14,792.78.

10. On Tuesday, March 23, 2010, Qasem started with a cash balance of $14,792.78 and sold $10,665.10 in money orders and $5,061.35 in Western Union transfers and collected $1,120.94 in utility payments and $177.51 in fees. Qasem cashed $13,520.10 in checks and recorded an ending cash balance of $18,291.73.

11. Inexplicably, on Wednesday, March 24, 2010, Qasem's records show a starting cash balance of $28,291.73, meaning $10,000

in cash was added to the starting cash balance from a source other than Qasem’s check cashing business. The notebook page contains no explanation. Qasem sold $4,744.93 in money orders and $7,633.46 in Western Union transfers and collected $305.43 in utility payments and $99.84 in fees. Qasem cashed checks in the amount of $4,947.71 and noted an ending cash balance of $25,570.58.

12. Bank records for Greens Check Cashing showed a $36,906.50 deposit on March 24, 2010. This is the total of checks cashed from March 22 and 23, 2010, plus $10,000 ($13,386.40 + 13,520.10 + $10,000). While it explains the number, it does not explain the source of the cash.[2]

13. On Thursday, March 25, 2010, Qasem’s records showed a beginning cash balance of $25,570. He sold $10,533.21 in money orders[3] and $4,914.83 in Western Union transfers[4] and collected $732.19 in utility payments and $175.28 in fees. Qasem cashed checks in the amount of $11,954.78 and recorded an ending cash balance of $29,966.48. The bank records reflect that Qasem deposited the checks into his bank account the following day.[5]

---

[2] Even if the court were to assume that the $10,000 in cash did not belong to Qasem, its addition to the opening balance and subtraction at the end of the day had no effect on the ownership of the cash on hand on Saturday, March 27, 2010.

[3] This number was verified by a transaction log.

[4] This number was verified by a transaction log.

[5] The bank statement shows a deposit in the amount of $11,954.78 was made on March 26, 2010. Thus, Qasem did not deposit

14. On Friday, March 26, 2010, Qasem's records showed that his starting cash balance was $29,966.48. He sold $11,409.16 in money orders[6] and $8,256.66 in Western Union transfers,[7] and collected $1,818.58 in utility payments and $310.82 in fees. Qasem cashed checks in the amount of $22,251.40 and recorded an ending cash balance of $29,503.13.

15. On Saturday, March 27, 2010, the day of the seizure, Qasem's records showed that his starting cash balance was $29,503.13. Prior to the seizure, he sold $4,636.80 in money orders[8] and $6,961 in Western Union transfers.[9] Qasem collected $268.34 in utility payments that day. Qasem's records showed a combined amount for both ending cash and cashed checks of $3,041.75. Based on these numbers, it was possible for Qasem to have in excess of $34,000 in cash on hand at the time of the seizure.

---

any cash on hand immediately prior to the seizure, other than the $10,000 amount discussed above.

[6] This number was verified by a transaction log.

[7] This number was verified by a transaction log.

[8] This number was verified by a transaction log.

[9] This number was verified by a transaction log showing the total transfers for the day; it is not clear how much of that figure was on hand at the time of the seizure.

16. The following day, March 28, 2010, Qasem's records show a beginning cash balance of $3,041.73. His records also show checks cashed in the amounts of $4,137.36 and $7,081.01.[10]

17. Qasem testified that he covered the deficit of the seized money with $20,000 from the "outside."

18. Deputy U.S. Marshal Marianne Matus ("Matus") testified that she and four other deputy marshals went to the Food World grocery store on March 27, 2010, accompanied by attorney David Moulton. Matus stated that Yousef was standing in the doorway of the customer service booth along with two other men, Qasem, and a third person, later identified as Jihad Yousef ("Jihad"). She and Deputy U.S. Marshal Patrick Smith ("Smith") first approached Yousef based on information that he typically carried a handgun on his person. Yousef was found in possession of a firearm that day and it was removed for the safety of all present.

19. According to Matus, there was nothing that denominated the customer service booth as a separate business. It said "Customer Service" in large letters on the outside wall of the booth. The door to the booth was open and it appeared that Yousef and Qasem were preparing to eat lunch at the booth's window counter.

---

[10] It is possible that one of these amounts is from the day before and simply recorded on the wrong date. Even if either of these amounts had been paid out, there was still enough cash on hand to be consistent with Qasem's claim that $34,662.36 belongs to him.

20. Qasem told Matus that he owned the check cashing business that operated from the customer service window. Because persons often try to hide money during a seizure, Matus secured the cash drawers of all cash registers, including the one in the booth. Qasem told her that if she took his money, he would not be able to pay Western Union on Monday. Matus found the drawers to the safe unlocked, but closed. She does not remember anyone unlocking either safe drawer.

21. When Matus asked Qasem for any contracts verifying that the booth represented a separate business, Qasem told her he had none because everything was based on oral agreements. He stated that he paid $2,000 per month in rent to the store. Accordingly, the deputies attributed $2,000 in Qasem’s money as rent owed to Food World on the seizure receipt.

22. Matus was informed that Jihad had purchased the Food World grocery store from Yousef. Matus was provided no documentation to support this claim.

23. Matus prepared the marshal’s receipt that showed that $51,350.33 in cash was seized. The receipt reflected that $34,662.36 belonged to Qasem. This statement was written by Matus because Qasem insisted that she write it on the form. Matus testified that she was not making a determination of his ownership when she made this notation on the receipt.

24. Deputy U.S. Marshal Smith testified that when the seizure team arrived at the store, three men were talking in the doorway of the customer service booth. He disarmed Yousef and secured his weapon. Smith denied telling Qasem to open his portion of the safe. Smith stated that when he saw the safe, a drawer was open; however, he could not recall which drawer was open.

25. Smith agreed that Qasem represented that he was the owner of cash located in the safe and that if the money was seized, he would be unable to pay for the Western Union transfers and money orders on Monday.

26. Smith stated that Yousef claimed to have sold the store to Jihad, a relative; however, Yousef was unable to produce any documentation of that assertion. Smith also agreed with Matus that it was common for persons to deny ownership of property in order that it not be seized.

27. Yousef testified that he sold the store to his nephew, Jihad, at the beginning of 2010 but still works there "for now." Yousef claimed, without support, Jihad paid him $25,000 cash in January 2010 and $175,000 in March via a check. Yousef testified that he cashed the $175,000 check and paid store vendors as well as other people to whom he owed money. Yousef provided no documentation for his assertions. Additionally, Yousef could not recall material details of the transaction or the names of individuals he claims to have paid with the sale's proceeds. The

court finds that Yousef's testimony about the purported sale of the grocery store to be not credible and disregards any claim that ownership of the store has changed hands.

28. David Moulton ("Moulton") testified that at the time of the seizure, the top drawer of the safe was open and the bottom drawer was open a crack. Qasem told Moulton that he had an oral lease with the grocery store. Moulton attempted to verify this statement with Yousef which resulted in a loud, emotional outburst from Qasem that Moulton was attempting to "come between" Qasem and Yousef. Apparently, the marshals repeatedly had to calm Qasem and Yousef during the seizure. At one point Yousef accused Moulton of being a thief. Yousef also stated, "You're too late; I've sold the business."

29. In contrast to Qasem and Yousef, Moulton stated that Jihad, the reported owner of the store, was very calm during the seizure, so calm that he fell asleep. Yousef, however, remained very upset during the entire seizure and made threats to Moulton and his children.

30. Although Qasem informed the deputies that the check cashing business was separate from the Food World business, a number of factors called that representation into doubt. At the

time of the seizure, there was nothing on the outside of the customer service booth that denominated it as a separate business.[11]

31. Qasem admitted that he shared the booth with the store, a statement which was consistent with Yousef's presence in the doorway of the booth. The computer in the booth belonged to the store and the store used the booth as an office. The booth housed numerous file cabinets, and Qasem testified that only one drawer out of the many file cabinets present was dedicated to his exclusive use. Also, the drawers of the safe were open, giving both Qasem and Yousef access to their contents.

32. Qasem admitted that he is very good friends with Yousef. Yousef testified that he occasionally helped Qasem in his business by selling phone cards and issuing money orders when Qasem was not available. Yousef also occasionally cashed checks for Qasem's business if Yousef was familiar with the check.

33. In light of all the facts known at the time of the seizure, the court finds that the deputy marshals were correct in doubting the unverified representations of Qasem that some of the money in the safe belonged to his separate business. The court finds that the deputy marshals properly seized all the cash on the Food World premises.

---

[11] Since the seizure, Qasem has put up large signs that denominate the customer service booth as a separate business.

34. However, in light of documentation submitted at and after the post-seizure hearing, the court finds that $2,559.33, representing the cash located in the cash drawer, and $34,662.36 found in the safe, belong to Qasem. It is therefore **ORDERED** that $37,221.69 be returned to Qasem.

35. As there is no credible evidence corroborating the claimed sale of the grocery store, the ownership of the remainder of the cash seized is attributed to SY Foods, Inc., and Yousef. Thus, $14,128.31 was properly seized and may be applied to the judgment debt.

**SIGNED** this 9th day of June, 2010.

Nancy K. Johnson
United States Magistrate Judge